WO          IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

JEFFREY JAMES WRANICH,               )
                                     )
                    Plaintiff,       )
                                     )
     vs.                             )
                                     )
KILOLO KIJAKAZI,                     )
                                     )     No. 3:22-cv-0119-HRH
                    Defendant.       )
_____)


O R D E R

        This is an action for judicial review of the denial of disability benefits under Title II

and Title XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381-1383f.  Plaintiff

Jeffrey James Wranich has timely filed his opening brief[1] to which defendant, Kilolo

Kijakazi, has timely responded.[2]  Oral argument was not requested and is not deemed

necessary.

Procedural Background

        On January 31, 2019, plaintiff filed applications for disability benefits under Title II

and Title XVI, alleging that he became disabled on October 10, 2016.  Plaintiff alleges that

he is disabled due to schizophrenia, chronic back pain with radiculopathy, leg pain and

weakness, anxiety, insomnia, sleep terror disorder, left handed tendonitis, and depression.

_____

        [1]Docket No. 15.

        [2]Docket No. 16.

-1-

Plaintiff's applications were denied initially, and he requested an administrative hearing. After a hearing on March 19, 2021, an administrative law judge (ALJ) denied plaintiff's applications. On March 14, 2022, the Appeals Council denied plaintiff's request for review, thereby making the ALJ's April 28, 2021, decision the final decision of defendant. On May 10, 2022, plaintiff commenced this action for judicial review of defendant's final decision.

## General Background

Plaintiff was born on August 22, 1981. He was 35 years old as of the alleged onset of disability date. Plaintiff has a GED. Plaintiff's past relevant work includes work as a counter person in a hydraulic hose shop, a technician in a tool repair center, a fork lift driver, and a repair technician in a hardware store and in an equipment rental shop.

## The ALJ's Decision

The ALJ first found that plaintiff met "the insured status requirements of the Social Security Act through December 31, 2021."[3]

The ALJ next applied the five-step sequential analysis used to determine whether an individual is disabled.[4]

---

[3]Admin. Rec. at 15.

[4]The five steps are as follows:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
> Step two: Is the claimant's alleged impairment sufficiently severe to limit ... h[is] ability to work? If so, proceed to step

(continued...)

At step one, the ALJ found that plaintiff had "not engaged in substantial gainful activity since October 10, 2016, the alleged onset date...."[5]

At step two, the ALJ found that plaintiff had "the following severe impairment: degenerative disc disease of the lumbar spine...."[6] The ALJ found that plaintiff's mood disorder, anxiety disorder, personality disorder, and substance use disorder were non-severe impairments.[7] The ALJ found that plaintiff had mild limitations in all four "paragraph B" areas.[8] The ALJ discounted plaintiff's symptom statements related to his mental impairments because of his lack of treatment for his mental impairments, because his treatment records

---

[4](...continued)
> three. If not, the claimant is not disabled.
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform ... h[is] past relevant work? If so, the claimant is not disabled. f not, proceed to step five.
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow ... h[im] to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

[5]Admin. Rec. at 15.

[6]Admin. Rec. at 15.

[7]Admin. Rec. at 16.

[8]Admin. Rec. at 16.

-3-

were "silent regarding the claimant's appearance with a service animal," because he made

inconsistent statements, and because of his daily activities.[9] The ALJ considered opinion

evidence.[10] The ALJ found Runyan's statement unpersuasive.[11] The ALJ also found Dr.

Meis's opinion unpersuasive.[12] And, the ALJ found Dr. Koutrakos's opinion unpersuasive.[13]

---

[9]Admin. Rec. at 16-17.

[10]Admin. Rec. at 17-18.

[11]On June 21, 2017, Kimberly Runyan, LCSW, opined that plaintiff would be "[u]nable to function independently in employment[.]" Admin. Rec. at 298.

[12]After completing a comprehensive psychiatric evaluation on October 9, 2019, Dr. Meis opined that plaintiff's

> ability to manage [his] funds is poor, given his ongoing sub-
> stance use. The claimant's ability to perform simple and
> repetitive tasks is poor, and [his] ability to perform detailed and
> complex tasks is poor, based on his performance on the cogni-
> tive exam. The claimant's ability to perform work activities
> reliably and efficiently without special or additional instructions
> is poor, based on his self-report of daily activities of daily living
> and also due to requiring numerous prompts during the exam in
> order to complete basic tasks. The claimant's ability to maintain
> regular attendance in the workplace is poor, based on his
> difficulty with anxiety and interpersonal conflict when leaving
> his residence. The claimant's ability to interact with coworkers
> and the public and adapt to the usual stresses encountered in the
> workplace is poor, based on his stated interpersonal anxiety and
> difficulty with functioning in public.

Admin. Rec. at 608.

[13]On December 12, 2019, Stacy Koutrakos, Psy.D., opined that plaintiff was not significantly limited in his ability to remember locations and work-like procedures, understand/remember/carry out very short and simple instructions, understand/remember
(continued...)

-4-

At step three, the ALJ found that plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1...."[14] The ALJ considered Listing "1.15 (regarding disorders of the skeletal spine resulting in compromise of a nerve root) and 1.16 (regarding lumbar spinal stenosis resulting in compromise of the cauda equina)."[15]

"Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC." Bray v. Comm'r of Social Security Admin., 554 F.3d 1219, 1222–23 (9th Cir. 2009). The ALJ found that plaintiff had

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following additional limitations: he can occasionally lift up to 50

---

[13](...continued)
detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, ask simple questions or request assistance, be aware of normal hazards and take appropriate precautions, travel to unfamiliar places, use public transportation, set realistic goals, and make plans independently of others; was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Admin. Rec. at 90-92.

[14]Admin. Rec. at 19.

[15]Admin. Rec. at 19.

pounds. He can frequently lift up to ten pounds. He can stand for one hour at a time for up to four hours in an eight-hour workday. He can walk for thirty minutes at a time for up to two hours in an eight-hour workday. He can sit for up to six hours in an eight-hour workday with normal breaks. He can occasionally climb ramps or stairs. He can occasionally stoop, kneel, crouch, or crawl. He can frequently balance. He can never climb ladders, ropes or scaffolds. He must avoid moderate exposure to respiratory irritants. He must avoid all unprotected heights. He must avoid moderate exposure to the operational control of moving machinery.[16]

The ALJ discounted plaintiff's pain and symptom statements related to his physical impairments because they were not entirely consistent with the medical evidence, because of drug seeking behavior, because he indicated he intended to go back to work, because he made inconsistent statements about his symptoms and limitations, and because he "engaged in activities that suggest he is not as physically limited as he alleged."[17]

The ALJ found Dr. Lebeau's opinion the "most persuasive...."[18] The ALJ found Dr.

---

[16]Admin. Rec. at 19.

[17]Admin. Rec. at 21-23.

[18]Admin. Rec. at 23. Dr. Jack Lebeau, the medical expert, testified that plaintiff was unlimited as to sitting; could stand for four hours; walk for two hours; lift/carry "10 pounds frequently, 20 pounds occasionally and only occasionally [lift] up to 50 pounds[;]" was unlimited as to reaching, handling, fingering, and feeling; had no limitations as to pushing/pulling or using feet for repetitive motion; could occasionally climb ladders/scaffolds; could never climb ropes; could frequently balance; could occasionally stoop, kneel, crouch, and crawl; could never be around unprotected heights; could occasionally be around moving mechanical parts; could frequently operate a motor vehicle; could occasionally be exposed to dust, fumes, and odors; and was unlimited as to heat, cold, humidity, and noise. Admin. Rec. at 51-53.

-6-

Backlund's opinion "partially persuasive...."[19] The ALJ found PAC Bigelow's opinion[20] and PAC Patton's opinion[21] unpersuasive.[22] The ALJ also found Kerris's opinion unpersuasive.[23] The ALJ considered Aurora Wranich's statements and found them to be "not entirely

---

[19]Admin. Rec. at 24. On November 27, 2019, Dr. Backlund, a nonexamining source, opined that plaintiff could occasionally lift/carry 20 pounds; could frequently lift/carry 10 pounds; could sit for 6 hours; was unlimited as to pushing/pulling; could occasionally climb ramps/stairs/ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl; and could frequently balance. Admin. Rec. at 87-88.

[20]PAC Bigelow examined plaintiff on October 9, 2019, and found that plaintiff had weakness to his "left lower extremity." Admin. Rec. at 613.

[21]On July 23, 2018, PAC Patton, who treated plaintiff at the Anchorage Neighborhood Health Clinic, completed a disability parking permit form on which he noted that plaintiff could not walk 200 feet without having to stop to rest. Admin. Rec. at 677.

[22]Admin. Rec. at 24-25.

[23]Admin. Rec. at 24. On July 16, 2018, plaintiff had a physical work performance evaluation done by Kathryn Kerris, an occupational therapist. Kerris opined that plaintiff could not

> perform the full range of Sedentary work as defined by the US Dept. of Labor in the DOT. This is due to difficulties performing the dynamic strength, and the mobility demands of work. The client has difficulty performing even Sedentary level work due to limitations with Lifting to Waist, Lifting to Eye Level, Bilateral Carrying, Unilateral Carrying, Pushing and Pulling tasks. Walking is very limited due to gait deviations and walks with a cane. Sitting and standing are limited as well. With all these difficulties it is hard to imagine him being able to keep a job. These difficulties were due to a high level of pain in the low back; impaired movement patterns and poor body mechanics in the lower limbs[.]

Admin. Rec. at 310.

-7-

consistent with the overall record...."[24]

At step four, the ALJ found that plaintiff was "unable to perform any past relevant work...."[25]

At step five, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform...."[26] Based on the vocational expert's testimony, the ALJ found that plaintiff could work as a packing inspector, an electronics worker, and a hand finisher.[27]

The ALJ concluded that plaintiff had "not been under a disability, as defined in the Social Security Act, from October 10, 2016, through the date of this decision...."[28]

<u>Standard of Review</u>

Pursuant to 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner...." The court "properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." <u>Sandgathe v. Chater</u>, 108 F.3d 978, 980 (9th Cir. 1997). "Substantial evidence

---

[24]Admin. Rec. at 25. Aurora Wranich, plaintiff's wife, completed a third-party function report on May 10, 2019. Admin. Rec. at 238-246.

[25]Admin. Rec. at 25.

[26]Admin. Rec. at 26.

[27]Admin. Rec. at 26.

[28]Admin. Rec. at 27.

-8-

is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). "'To determine whether substantial evidence supports the ALJ's decision, [the court] review[s] the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" Id. (quoting Andrews, 53 F.3d at 1039). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the Commissioner's decision. Id. But, the Commissioner's decision cannot be affirmed "'simply by isolating a specific quantum of supporting evidence.'" Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999)).

<u>Discussion</u>

Plaintiff first argues that the ALJ improperly evaluated his mental impairments, which resulted in an unsupported and incomplete RFC. As set out above, at step two, the ALJ found that plaintiff's mood disorder, anxiety disorder, personality disorder, and substance use disorder were non-severe impairments,[29] meaning that they did "not significantly limit [his] mental ability to do basic work activities." 20 C.F.R. § 404.1522. The ALJ found that plaintiff did "not have more than mild limitations in" the "four broad areas of mental functioning ... known as the 'paragraph B' criteria[.]"[30] In support of her non-severe finding,

---

[29]Admin. Rec. at 16.

[30]Admin. Rec. at 16.

the ALJ relied on plaintiff's mental status examinations,[31] discounted plaintiff's symptom statements related to his mental impairments,[32] and considered the "mental opinion evidence."[33]

"The evaluation of claimed impairments at Step Two of the sequential evaluation process is a de minimis test intended to weed out the most minor of impairments, as well as functioning as a screening device to dispose of patently groundless claims." Tudor v. Saul, 484 F.Supp.3d 717, 725–26 (N.D. Cal. 2020). "[A] finding of non-severity at Step Two must be 'clearly established by medical evidence....'" Id. (quoting Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005)).

Other than the opinion evidence, the only medical evidence the ALJ relied upon in support of her non-severe finding was plaintiff's mental status exams. The ALJ found that "most of [plaintiff's] mental status examinations ... revealed largely unremarkable mental presentation" and suggested that this evidence supported her non-severe finding.[34]

Mental status exams are only one piece of evidence ALJs are to consider when assessing a claimant's mental impairments. Moreover, mental status exams are "'a mere snapshot of'" a claimant's "'functioning on a particular day, and' do not 'constitute[]

---

[31]Admin. Rec. at 16.

[32]Admin. Rec. at 16-17.

[33]Admin. Rec. at 17-18.

[34]Admin. Rec. at 16.

-10-

substantial evidence[.]'" <u>Steele v. Saul</u>, 520 F.Supp.3d 1198, 1210 (D. Alaska 2021) (quoting <u>Harris v. Berryhill</u>, Case No. 2:17-cv-02741-RFB-BNW, 2019 WL 2068469, at *3 (D. Nev. May 10, 2019)). The ALJ should not have relied so heavily on some benign mental status exam findings. These exams do not support the ALJ's non-severe finding.

Plaintiff also argues that the ALJ erred in relying on a specific finding from some of his mental status exams to conclude that he was not as limited by his mental impairments as he claimed. The ALJ pointed out that plaintiff's benign mental status exams showed that he was cooperative.[35] But, plaintiff's ability to interact, or cooperate, with medical professionals, especially trained mental health providers, is not the same as having the ability to interact with supervisors, coworkers or members of the general public. As another court has explained,

> the fact that a claimant manages to be cooperative with her healthcare providers does not contradict those providers' opinions that the claimant is severely limited in her ability to interact with coworkers, supervisors, or the general public. Plaintiff's healthcare providers are professionals trained to deal with mentally and physically ill or disabled patients. Furthermore, a medical treatment relationship is not like the relationship a worker has with her coworkers, supervisors, or the general public. The goals and nature of interacting with healthcare providers is different. The Social Security Administration's regulation concerning evidence of functioning in supportive situations is instructive here: "Your ability to complete tasks in settings that are highly structured, or that are less demanding or more supportive than typical work settings does not necessarily demonstrate your ability to complete tasks

---

[35]Admin. Rec. at 16.

in the context of regular employment during a normal workday or work week." 20 C.F.R. 404, Subpart P, App'x 1, § 12.00(C)(6)(b) (2016). Interactions with treatment providers are likely to be "less demanding or more supportive than typical work settings" and thus do not demonstrate an ability to work with coworkers, supervisors, or the general public in a work setting.

Tina R. v. Comm'r of Social Sec., Case No. C18-1041JLR, 2019 WL 1417301, at *5 (W.D. Wash. March 29, 2019). That plaintiff might have been cooperative with his medical providers says little about whether or not his mental impairments are severe. It should also be noted that at times, plaintiff had significant behavioral issues with medical personnel. For instance, during plaintiff's January 2018 admission to Providence Psych ER, it was noted that he was "repeatedly threatening staff."[36] An ALJ may not cherry-picked the record to find evidence that supports her conclusion, while ignoring evidence to the contrary. See Garrison v. Colvin, 759 F.3d 995, 1017, n.23 (9th Cir. 2014) (citation omitted) (ALJ "not permitted to 'cherry-pick'" from "mixed results to support a denial of benefits").

Plaintiff next argues that the ALJ erred in discounting his symptom statements at step two.

> [W]hen a claimant presents "objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms [the claimant] alleged," the ALJ is required to determine the extent to which the claimant's statements regarding the intensity, persistence, and limiting effects of his or her subjective symptoms ... are consistent with the record evidence as a whole and, consequently, whether any of the

---

[36]Admin. Rec. at 366.

> individual's symptom-related functional limitations and restric-
> tions are likely to reduce the claimant's capacity to perform
> work-related activities.

Lourdes C. v. Saul, Case No. 8:19-cv-01531-JC, 2020 WL 2733666, at *3 (C.D. Cal. May 25, 2020) (quoting 20 C.F.R. §§ 404.1529(a), (c)(4); SSR 16-3p). "When an individual's subjective statements are inconsistent with other evidence in the record, an ALJ may give less weight to such statements and, in turn, find that the individual's symptoms are less likely to reduce the claimant's capacity to perform work-related activities." Id. "In such cases, when there is no affirmative finding of malingering, an ALJ may 'reject' or give less weight to the individual's subjective statements 'only by providing specific, clear, and convincing reasons for doing so.'" Id. (quoting Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015)). "This requirement is very difficult to satisfy." Id.

The ALJ discounted plaintiff's symptom statements related to his mental impairments because of his lack of treatment for his mental impairments, because his treatment records were "silent regarding the claimant's appearance with a service animal," because he made inconsistent statements, and because of his daily activities.[37] Plaintiff argues that none of these were clear and convincing reasons.

As for plaintiff's lack of treatment, the ALJ found that "[t]he record reveals that the claimant discontinued all treatment on his own and did not follow up" and concluded that "[i]f the claimant's mental health symptoms were as chronic and severe as he alleged, one

_____

[37]Admin. Rec. at 16-17.

-13-

would reasonably expect that he would have sought regular care for such symptoms."[38] But, as the Ninth Circuit has long recognized, a claimant "'may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (quoting Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989)).

Defendant, however, argues that in order to show that the ALJ erred in considering his lack of treatment, plaintiff must provide medical evidence that his resistance to treatment was attributable to a mental impairment and not just a personal preference. See Molina v. Astrue, 674 F.3d 1104, 1114 (9th Cir. 2012) (citation omitted) ("[a]lthough Molina provided reasons for resisting treatment, there was no medical evidence that Molina's resistance was attributable to her mental impairment rather than her own personal preference, and it was reasonable for the ALJ to conclude that the level or frequency of treatment [was] inconsistent with the level of complaints"). Defendant argues that plaintiff has not made the requisite showing here and that there is no medical evidence that plaintiff's lack of mental health treatment was due to his mental impairments.

But, as other courts have found, "when the evidence suggests lack of mental health treatment is partly due to a claimant's mental health condition, it may be inappropriate to consider a claimant's lack of mental health treatment when evaluating the claimant's failure

---

[38]Admin. Rec. at 16.

-14-

to participate in treatment." <u>Amber R. v. Kijakazi</u>, Case No. 1:20-cv-03115-MKD, 2021 WL 8134197, at *7 (E.D. Wash. Dec. 28, 2021) (citing <u>Nguyen</u>, 100 F.3d at 1465). The nature of plaintiff's mental impairments may, at least in part, explain why plaintiff did not pursue mental health treatment. Plaintiff's lack of treatment for his mental health impairments was not a clear and convincing reason for discounting plaintiff's symptom statements are they related to his mental impairments.

The ALJ also discounted plaintiff's symptom statements because although plaintiff claimed he "require[d] the presence of his dog to determine whether voices and sights are 'real,' few providers observed the claimant appearing to treatment with a service animal...."[39] An ALJ may discount a claimant's pain and symptom statements if the claimant fails to ever report such symptoms to his treating providers. <u>Greger v. Barnhart</u>, 464 F.3d 968, 972 (9th Cir. 2006). A review of the longitudinal record shows that plaintiff did not acquire his service dog until sometime in 2019[40] and thereafter, there are notations in providers' records of plaintiff being accompanied by his service dog.[41] This was not a clear and consistent reason for the ALJ to discount plaintiff's symptom statements as they related to his mental impairments.

As for the inconsistent statements, the ALJ gave three examples. First, the ALJ found

---

[39]Admin. Rec. at 17.

[40]Admin. Rec. at 630.

[41]<u>See</u>, <u>e.g.</u>, Admin. Rec. at 629.

-15-

that "in June 2017, the claimant told providers that he did not use cannabis; however, he tested positive for cannabis...."[42]  The ALJ cited to a May 29, 2017, lab report, which was included in a June 2, 2017, treatment note from API which was positive for cannabis, but curiously, nowhere in that treatment note was it indicated that plaintiff had told providers he did not use cannabis.  In fact, the treatment note indicates that plaintiff "endorses using marijuana" and has a history of cannabis abuse.[43]  Contrary to the ALJ's finding, this was not an example of an inconsistent statement.

The second example of an inconsistent statement that the ALJ gave was that plaintiff "denied ever doing methamphetamines, but was released from pain management care due to methamphetamines on his drug screen...."[44]  In Dr. Lui's treatment notes, there is a notation that plaintiff "was dismissed from AA Pain Clinic for having Methamphetamine in his urine drug screen" and that plaintiff "deni[ed] ever doing Methamphetamine and he thinks that it was coming from marijuana he was buying from his neighbor."[45]  This too is not an example of an inconsistent statement.  Plaintiff did not dispute that his drug screens showed methamphetamine.  Rather, he explained why he believed it showed up on his drug screens even though he claimed he was not doing meth.

---

[42]Admin. Rec. at 17.

[43]Admin. Rec. at 277-279.

[44]Admin. Rec. at 17.

[45]Admin. Rec. at 666.

-16-

The third example was in December 2018, at Alaska Regional Hospital. Dr. Calvert noted that plaintiff's drug screen was positive for methamphetamines despite his claim that he had not used any illicit drugs for over a year.[46] This was around the same time that plaintiff saw Dr. Lui, so it is reasonable to assume that plaintiff's explanation for why meth showed up on his drug screen would have been the same, that it was in the marijuana he was buying from his neighbor. Thus, this was also not an example of an inconsistent statement.

But even if these last two examples could be viewed as inconsistent statements, these inconsistent statements about his drug use were not a clear and convincing reason for the ALJ to discount plaintiff's symptom statements as they related to his mental impairments. For the most part, plaintiff was quite up front with his providers about his drug use. The fact that he may have made one or two inconsistent statements about his drug use does not mean that his statements about his mental health impairments were not to be believed.

As for activities of daily living, the ALJ made much of the fact that plaintiff "drives a car" and that "he helps his kids with their schoolwork."[47] But, these two activities, either alone or together, do not constitute a clear and convincing reason for the ALJ to discount plaintiff's symptom statements related to his mental impairments.

As for driving the car, the ALJ focused on the physical requirements of driving a car and did not explain how plaintiff's ability to drive a car related to his mental functioning.

---

[46]Admin. Rec. at 579.

[47]Admin. Rec. at 17.

-17-

As for helping his kids with their homework, the ALJ noted that plaintiff "did not indicate any difficulty understanding the material, remembering the information, or concentrating enough to help his kids complete assignments."[48]  First of all, as plaintiff emphasizes, the ALJ found that he had not indicated any problems with understanding, remembering, and concentrating and "where subjective symptoms are concerned, absence of evidence is not evidence of absence."  Rivera v. Colvin, Case No. 6:12–cv–02132–MO, 2013 WL 6002445, at *4 (D. Or. Nov. 12, 2013).  Secondly, plaintiff did not testify that his helping his kids with their schoolwork included the need to understand the material, remember the information, or concentrate long enough for the children to complete their assignments.  Rather, plaintiff testified that he made sure his children "do their schoolwork, get them up in time to logon, help them, you know, assisting and stuff like that[,]"[49] and Dr. Meis simply noted that plaintiff stated that he "help[ed]" his children with their schoolwork.[50]

Because the ALJ improperly relied on plaintiff's mental status exams and improperly discounted plaintiff's symptom statements related to his mental impairments, the ALJ erred at step two in finding plaintiff's mental health impairments non-severe.  The question then is whether this error was harmless.  An error is harmless if it is "'inconsequential to the ultimate nondisability determination.'"  Ford v. Saul, 950 F.3d 1141, 1154 (9th Cir. 2020)

---

[48]Admin. Rec. at 17.

[49]Admin. Rec. at 64.

[50]Admin. Rec. at 606.

-18-

(quoting Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008)).

The ALJ's step two error was not harmless because it resulted in an incomplete RFC.

The ALJ found that plaintiff had

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following additional limitations: he can occasionally lift up to 50 pounds. He can frequently lift up to ten pounds. He can stand for one hour at a time for up to four hours in an eight-hour workday. He can walk for thirty minutes at a time for up to two hours in an eight-hour workday. He can sit for up to six hours in an eight-hour workday with normal breaks. He can occasionally climb ramps or stairs. He can occasionally stoop, kneel, crouch, or crawl. He can frequently balance. He can never climb ladders, ropes or scaffolds. He must avoid moderate exposure to respiratory irritants. He must avoid all unprotected heights. He must avoid moderate exposure to the operational control of moving machinery.[51]

Missing from this RFC were any limitations related to plaintiff's mental impairments. Apparently, the ALJ found that plaintiff did not have any limitations flowing from his mental impairments because she rejected all the opinion evidence on this matter. The ALJ considered the opinions of Runyan, Meis, and Koutrakos, all of whom opined as to the limitations flowing from plaintiff's mental impairments.[52] But, the ALJ rejected all of these opinions and the limitations found by these providers, in effect concluding that plaintiff had no limitations associated with his mental impairments and thus his mental impairments were non-severe. The problem with such a conclusion is that, in this case, it is not based on any

---

[51]Admin. Rec. at 19.

[52]Admin. Rec. at 17-18.

medical evidence.  Rather, it is based on the ALJ's interpretation of the medical evidence.

And, courts "have held that when an ALJ rejects the expert opinions in the record and instead

relies on his own judgment in determining a claimant's RFC, the ALJ's decision is

unsupported by substantial evidence." Gutierrez v. Kijakazi, Case No. 2:21-cv-01292-DJA,

2022 WL 1082296, at *4 (D. Nev. April 8, 2022).  Here, the ALJ's RFC was incomplete and

no supported by substantial evidence, which means that the ALJ's step-two error was not

harmless.

Plaintiff also argues that the ALJ erred in discounting his pain and symptom

statements as they related to his physical impairments.  The ALJ discounted these statements

because they were not entirely consistent with the medical evidence, because of plaintiff's

drug seeking behavior, because he indicated he intended to go back to work, because plaintiff

made inconsistent statements about his symptoms and limitations, and because plaintiff

"engaged in activities that suggest he is not as physically limited as he alleged."[53]  Plaintiff

argues that none of these were clear and convincing reasons.

As for the inconsistency with the medical evidence, plaintiff argues that all the ALJ

did was recite the medical evidence, which is not sufficient.  The Ninth Circuit has held "that

an ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's

testimony by simply reciting the medical evidence in support of his or her residual functional

capacity determination."  Brown-Hunter , 806 F.3d at 489.  Rather, the ALJ must "specify

---

[53]Admin. Rec. at 21-23.

which testimony she finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination." Id.

Here, the ALJ did much more than simply recite the medical evidence. The ALJ cited to imaging findings such as a 2018 lumbar MRI and "imaging taken in 2021[,]" and explained that this imaging of plaintiff's lumbar spine did "not support his claims of incapacitating pain."[54] The ALJ also noted that "many" of plaintiff's treatment notes "show normal gait, normal range of motion, normal strength and sensation in the upper and lower extremities, normal range of motion, normal reflexes, normal muscle bulk, normal muscle tone, normal coordination, and the ability to sit upright in a chair without any difficulty[,]"[55] and explained that this "evidence indicates that his limitations are not as severe as he described."[56] The ALJ also noted that plaintiff "discontinued epidural injections even though they helped with his symptoms and did not participate in ongoing physical therapy or strength training" and at times, "outright declined treatment[.]"[57] And, the ALJ also noted that "[c]ontrary to his allegations of persistent balance and coordination problems that lead to falling about five times per week ..., the claimant generally reported only vague instances of

---

[54]Admin. Rec. at 21 (citing Admin. Rec. at 669, 707).

[55]Admin. Rec. at 21 (citing Admin. Rec. at 278-279, 327, 517, 521, 574, 583, 588, 699, 703-704).

[56]Admin. Rec. at 22.

[57]Admin. Rec. at 22 (citing Admin. Rec. at 337, 613, 630, 670).

falling or stumbling...."[58] The ALJ explained that "[i]f the claimant was so functionally limited that he experienced a fall nearly every day, one might reasonably expect him to have reported the details of such profound limitations to providers and to have more urgently sought diagnostics or treatment to address the same."[59] The ALJ specified which medical evidence contradicted plaintiff's statements and explained why it did so. The ALJ did not err in discounting plaintiff's pain and symptom statements related to his physical impairments because these statements were inconsistent with the medical evidence of record.

As for drug-seeking behavior, there was such evidence in the record, as the ALJ found. On January 22, 2018, it was noted that while plaintiff was "in the psych ED, [he] did appear to be med seeking. He commented that the medication felt like a placebo indicating that he wanted stronger sedatives."[60] On August 2, 2018, during a visit at Apex Neurosurgery, plaintiff "[d]id request narcotics ..., which were not given."[61] On August 15, 2018, Dr. Lui noted that "[g]iven extensive history of urine drug screen inconsistencies, the patient's psychiatric issues and his current unwillingness to try treatment modalities that are not opiate medication, which demonstrates drug seeking behavior, I do not think he is a candidate for

---

[58]Admin. Rec. at 22 (citing Admin. Rec. at 315, 629, 640).

[59]Admin. Rec. at 22.

[60]Admin. Rec. at 692.

[61]Admin. Rec. at 675.

opioid medication."[62]  Contrary to plaintiff's contention, an ALJ may discount a claimant's pain and symptom statements due to drug-seeking behavior.  Coleman v. Saul, 979 F.3d 751, 756 (9th Cir. 2020).  Plaintiff's drug-seeking was a clear and convincing reason for discounting his pain and symptom statements as they related to his physical impairments.

As for plaintiff's statements about intending to work, the record does include such statements.  On January 22, 2018, in the treatment notes from Providence, it was noted that plaintiff "was very future oriented stating that he is trying to find a job."[63]  And on August 13, 2018, plaintiff told Dr. Lui that he wanted to go back to school and that "[h]e recognizes that he needs to get a job without physical labor."[64]  The ALJ explained that "[t]rying to find a job, going back to school to further one's education, and acknowledging the need to find a less strenuous job conflict with the claimant's allegations of incapacitating physical limitations."[65]  This was a clear and convincing reason for discounting plaintiff's pain and symptom statements related to his physical impairments.

As for plaintiff's inconsistent statements, the ALJ stated that "[c]ontrary to the claimant's testimony that he drives to the methadone clinic approximately every two weeks ..., he told a consultative psychological examiner that he goes to the methadone clinic every

---

[62]Admin. Rec. at 670.

[63]Admin. Rec. at 692.

[64]Admin. Rec. at 666.

[65]Admin. Rec. at 22.

-23-

day ... and also reported that he only leaves the house about once every couple of months."[66] This was a clear and convincing reason, albeit a weak one, for discounting plaintiff's pain and symptom statements related to his physical impairments. Plaintiff did testify that he drives "probably once every two weeks[67] and that he typically drives to the methadone clinic.[68] If plaintiff drove to the methadone clinic, where he went every day, plaintiff was presumably driving more than once every two weeks. He did also report that he only "leave[s] the house/neighborhood" if he has an appointment, which is "maybe once every couple months."[69] But, again, if he left the house to go to the methadone clinic, he was leaving the house every day, or almost every day, rather than once every couple of months.

As for plaintiff's activities, the ALJ cited to a number of examples of activities that plaintiff engaged in which she found to be inconsistent with the physical limitations plaintiff claimed. First, the ALJ pointed out that plaintiff "told a consultative psychological examiner in October 2019 that he went hiking for about two hours two weeks prior to his examination" and found that his "ability to hike for two hours contrasts with his allegations of incapacitating physical limitations."[70] Plaintiff did tell Dr. Meis that he "went hiking at Flattop a couple

---

[66]Admin. Rec. at 23.

[67]Admin. Rec. at 55.

[68]Admin. Rec. at 56.

[69]Admin. Rec. at 232.

[70]Admin. Rec. at 23.

of weeks ago" and that he and his family "walked 2 hours on a relatively level portion."[71]

But, plaintiff also told Dr. Meis that "'[t]he mind was willing but the flesh was not" and that

he "was very sore and had difficulty functioning for several days afterwards."[72] Plaintiff's

going on a relatively short hike, after which he suffered for days, is not an activity that is

inconsistent with his claimed physical limitations.

The ALJ also pointed out that "[t]he record also indicate[d] that the claimant took his

children out fishing...."[73] The entire entry about the fishing trip is as follows: "Details an

incident recently when watching his children fish, thought he was sitting next to a man on

shore talking, his wife approached and asked who he was talking to, turned and the person

was gone."[74] This implies that plaintiff was having visual and auditory hallucinations on the

day of the fishing trip and also that all plaintiff was doing was watching his children fish, not

that he had driven them to the fishing site or was actively engaged in fishing with them. As

plaintiff contends, the ALJ failed to provide the proper context for the fishing trip and instead

focused on the benign aspect of the record, that plaintiff took his kids fishing. The ALJ

ignored the more serious aspect of the record, that plaintiff was having auditory and visual

hallucinations on the day of the fishing trip. An ALJ errs by "omitt[ing] a number of salient

---

[71]Admin. Rec. at 605.

[72]Admin. Rec. at 605.

[73]Admin. Rec. at 23.

[74]Admin. Rec. at 637.

-25-

and dispositive facts and details when recounting" a claimant's "activity level."  <u>Rawa v.</u> <u>Colvin</u>, 672 Fed.Appx. 664, 666 (9th Cir. 2016).  The fishing trip was not activity which was inconsistent with plaintiff's claimed physical limitations.

The ALJ also found plaintiff's ability to care for his children inconsistent with his claimed physical limitations, noting that plaintiff testified that he "plays games with and 'supervises' his children...."[75]  The ALJ questioned whether plaintiff "cares for his kids" more than he alleged given that his wife works.[76]  But, this is nothing more than speculation on the part of the ALJ.  And, the "games" that plaintiff testified he played with his children was a board game.[77]  Plaintiff's ability to care for his children was not an activity that was inconsistent with his claimed physical limitations.

The ALJ also noted that plaintiff "told one provider that he takes care of his sons and does all the cooking...."[78]  There is a note in the "social history" section in the treatment notes from Providence ED on December 18, 2017, that plaintiff "takes care of his sons and does all the cooking."[79]  But, as discussed above, the "care" that plaintiff provides for his sons is not physical care but more in terms of providing some supervision for them.  As for the

---

[75]Admin. Rec. at 23.

[76]Admin. Rec. at 23.

[77]Admin. Rec. at 65.

[78]Admin. Rec. at 23.

[79]Admin. Rec. at 516.

-26-

"cooking," the record indicates that plaintiff primarily reheated meals that were prepared by his wife or heated something up in the microwave,[80] an activity that is not inconsistent with plaintiff's claimed physical limitations.

None of the examples the ALJ gave of activities that plaintiff engaged in were inconsistent with plaintiff's claimed physical limitations. Thus, this was not a clear and convincing reason for the ALJ to discount plaintiff's pain and symptom statements related to his physical impairments.

That does not mean, however, that the ALJ erred in discounting plaintiff's pain and symptom statements as they related to his physical impairments. Although plaintiff's activities were not a clear and convincing reason, the other four reasons given by the ALJ were. The ALJ properly discounted plaintiff's physical impairment pain and symptom statements because they were not entirely consistent with the medical evidence, because of plaintiff's drug seeking behavior, because he indicated he intended to go back to work, and because plaintiff made inconsistent statements about his symptoms and limitations. These constitute substantial evidence, which means the ALJ did not err in discounting plaintiff's pain and symptom statements related to his physical impairments.

But, because the ALJ did err at step two and this error was not harmless, the court must consider whether to remand this matter for further proceedings or for an award of benefits. "Remand for further administrative proceedings is appropriate if enhancement of

---

[80]Admin. Rec. at 65, 230, 245.

the record would be useful." Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (emphasis omitted). "Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." Id.

Here, a remand for further proceedings is appropriate. It is for the ALJ to decide in the first instance what, if any, limitations flow from plaintiff's severe mental impairments.

Conclusion

The final decision of defendant is reversed and this matter is remanded for further proceedings.

DATED at Anchorage, Alaska, this 16th day of November, 2022.

/s/ H. Russel Holland
United States District Judge

-28-